16834

MASON v. WOODSIDE MILLS
(80 S. E. (2d) 344)

16

*Messrs. Haynsworth & Haynsworth,* of Greenville, *for Appellant, in reply,*

*Messrs. Hinson, Traxler & Hamer and Chandler & Chandler,* of Greenville, *for Respondent,*

February 15, 1954.

TAYLOR, Justice.

This appeal is from an order of the Court of Common Pleas for Greenville County sustaining an award of the Industrial Commission.

Respondent while employed by the Woodside Mills in Greenville, South Carolina, in April, 1950, suffered an injury which arose out of and in the course of his employment for which the Industrial Commissioner made an award of $750.00 for serious bodily disfigurement and for 90 per cent loss of use of the left arm. This award was affirmed by a majority of the Full Commission and the Court of Common Pleas for Greenville County and appellant now comes to this Court upon exceptions which present the question of whether or not there is sufficient evidence to support either the award for disability or disfigurement.

The respondent, a young man 23 years of age, slipped upon a wet floor and severely injured his left arm while in

the performance of his work as loom cleaner. His duties required the use of an air hose weighing approximately 100 pounds which was dragged from place to place and used to blow accumulated lint from the looms. First aid was immediately given and respondent sent to appellant's physician who made an *x*-ray and reported that he "had partial ankylosis of the joint at the left elbow involving limitation of motion and questionable chip fractures in the angle of the elbow joints." Respondent was then referred to another doctor who reading the same *x*-ray found "no fresh fracture" but "a severe sprain of the left elbow." Not being satisfied with his condition, respondent of his own accord later went to another doctor who found evidence of traumatic arthritis and concluded that "the degree of disability of the left elbow joint approached 100 per cent." This same physician examined respondent again in 1951 and reported it as being slightly improved and his condition "is fairly constant now" and stated that his disability as of that time (the second examination) was 90 per cent. A portion of this testimony appears as follows:

"Direct Examination by Mr. Chandler: Q. Let me go back—on the first examination, you testified that the right and left deltoid were equal? A. Yes, sir.

"Q. Will you tell us whether you examined that same thing in your later examination? A. I did.

"Q. What did you find, in comparison with the other examination? A. The deltoid of the left arm was one inch smaller in circumference than the right arm.

"Q. What about the biceps, comparing the two examinations? A. The biceps region was 1/10 inch smaller than the right arm.

"Q. All right sir. What about the fore-arm? A. It was 2/10 smaller on the first examination and the present finding was that the left fore-arm is 9/10 smaller than the right arm in circumference. * * *

"Q. Doctor, what change if any, did you notice? A. I found a slight improvement when I last examined him. He

had an additional 5 degrees of motion in the flexion of his elbow joint. He is able to pronate and supinate his hand with very little difficulty.

"Q. In your opinion, will this man get better or worse? What is his future? A. In view of the fact of the very small improvement in the last 8 or 9 months, I believe his situation is fairly constant now. I don't believe he will improve a great deal, barring surgery or things that could be done in the future. I don't know.

"Q. What do you attribute the difference in those measurements to, which you have quoted into the record? A. His arm has atrophied from disuse and he has a loss of function because of the limitation of motion in the elbow.

"Q. You testified that on your first examination his disability approached 100%, and you testify that he has had a slight improvement. What would you say now is the degree of disability? A. Approximately 90%."

Further consideration of the testimony reveals that Dr. Converse in his first examination in December, 1950, approximately 8 months after the injury found arthritis in respondent's left arm. Dr. Murray, appellant's physician to whom he was sent immediately after the injury, testified that he found no evidence of arthritis at that time.

Appellant bases its contention principally upon the statement signed by respondent at the time of his employment that he was suffering from a 40 per cent disability in this arm prior to the injury complained of and that such statement is binding upon respondent and that the Commission therefore could not make an award exceeding 50 per cent under the testimony, this being the difference between 40 per cent and the 90 per cent which claimant was found to be suffering at the time of the hearing. Respondent stated that he signed this statement but was not aware of its contents at the time and produced a great deal of testimony to the effect that it was not correct. The statement was accepted as evidence by the fact-finding body who presumably gave it such consideration as it saw fit under

the circumstances and in the light of all the evidence. Such statement when attacked by a claimant is evidence to be taken into consideration in conjunction with all the other evidence in the case and claimant under such circumstances is not bound thereby as a matter of law but the force and effect of such is to be determined by the fact-finding body unless such is prohibited by Section 72-131 of the 1952 Code of Laws for South Carolina, which we are not called upon to determine in this case.

One witness who operated a saw mill at which respondent was employed from 1946 until November, 1949, at which time he was employed by appellant, testified:

"Q. During the time you were working with Harry Mason, what was his job? A. He hauled lumber, he didn't have any particular job, maybe he would haul a day and cut the next day and drag the next day.

"Q. Is all that heavy work? A. It is heavy work. There is not many people would like it.

"Q. Did Harry Mason perform those jobs? A. Yes, sir, I had no complaint out of him whatever the job was.

"Q. He did as heavy work as any man there? A. That's right.

"Q. Did you see him work? A. Yes, sir, I worked with him.

"Q. You worked with him? A. Yes, sir, me and my brother got in the business together, and I guess you can see we was busy and I worked right with Harry and he has helped me load lumber 2 x 10 and 18 and that takes a good man to do it. When you put it on a truck 20 deep you have to sling them to get them up there."

There is also evidence that respondent had become a member of the South Carolina National Guard since his first injury and that upon doing so he was given a physical examination by Dr. J. L. Hughes and there is no notation of any such disability apparent as of that time; that while a member thereof, he engaged in the various strenuous duties

required of members of the National Guard. A portion of the testimony to this effect appears as follows:

"Q. All right sir, now on regular drill nights, what are some of the duties Mr. Mason would have to do when you were in charge of it? A. Well in case a tire had to be changed, the driver of the truck changed them—

"Q. Was Mr. Mason the driver of a truck? A. Yes, sir.

"Q. Tell us whether or not you ever saw him change one. A. At the time he was in the Battery, he was assigned to a two and a half ton GMC truck and changed all the tires on the truck.

"Q. What kind of tires did they have? A. I don't know exactly what the size would be, but they would weigh 100 pounds, I presume, or more.

"Q. What kind of a man does it take to change one of those tires? A. It takes a good man. A strong man.

"Q. What part do the arms play in removing tires? A. In removing and putting them on, the arms play a big part— it takes all of your arms.

"Q. You have testified that it takes a good man and takes all his arms * * * A. If one man puts them on by himself, he is a strong man. You have these lugs you have to fit it on when you lift it from the ground, and it is a heavy job."

Other witnesses testified that there was no evidence of any disability in the use of respondent's arm after its injury in 1945 and prior to his injury April 4, 1950.

It is hardly necessary to cite authority for the well established principle of law that the Industrial Commission is the fact-finding body and this Court and the Circuit Court both being Appellate Courts in Workmen's Compensation matters, can only review the facts to determine whether or not there is any competent evidence to support the findings of the fact-finding body. If there is, both this Court and the Circuit Court are without power to pass upon the force and effect of such evidence. *Rudd v. Fair-*

*forest Finishing Co.,* 189 S. C. 188, 200 S. E. 727; *Jones v. Anderson Cotton Mills,* 205 S. C. 247, 31 S. E. (2d) 447; *Radcliffe v. Southern Aviation School,* 209 S. C. 411, 40 S. E. (2d) 626.

In addition to the arm being more or less rigid, the Judge who heard this appeal in the Court of Common Pleas viewed the respondent (as did the Hearing Commissioner) and in his order he states that "There is a marked difference between the right and left arm, and the Hearing Commissioner's description appears to be accurate."

We are of the opinion that there is sufficient evidence to support the findings of the fact-finding body both as to disability and disfigurement; that all exceptions should be dismissed and it is so ordered.

BAKER, C. J., STUKES and OXNER, JJ., and Moss, Acting Associate Justice, concur.